VOLUSIA COUNTY, one of the Political Divisions of the State of Florida, by W. P. WILKINSON, G. A. TYLER, W. C. JACKSON, W. H. MCBRIDE and CHAS. B. JONES, County Commissioners of said Volusia County, Florida, *Appellants,* v. THE STATE OF FLORIDA and T. F. COVEY, *Appellees.*

Division A.

Opinion filed December 30, 1929.

Petition for rehearing denied January 28, 1930.

1168

*Hull, Landis & Whitehair,* Attorneys for Appellants;

*J. A. Scarlett,* State Attorney; *Stewart & Stewart* and *Clark Harper,* Attorneys for Appellees.

BROWN, J.—This is an appeal from a decree of the Circuit Court of Volusia County dismissing appellant's petition for the validation of certain refunding bonds which it desired to issue pursuant to a resolution adopted by the board of county commissioners of said county under the purported authority of Chapter 13488, Laws of Florida of 1927. The State attorney and appellee, Covey, who had been allowed to intervene, filed demurrer to the petition, which was sustained by the court, and the petitioner declining to amend, the court entered a final decree dismissing the petition.

.. After briefs had been filed in this Court by both appellant and appellees, appellee filed a suggestion to the effect

that the legislative act under which the board of county commissioners were seeking to issue the bonds had been repealed by Senate Bill No. 656 (now appearing as Chapter 14441), which it is alleged, was enacted at the regular session of the Legislature held in the year 1929. To this suggestion the appellant filed a reply alleging that said purported repealing act had not been passed by the Legislature in conformity with the requirements of the Constitution, for several different reasons. It would appear from the record before us that if the repealing act of 1929 was lawfully adopted, and became a law, the questions raised on this appeal as to the validity of the act repealed would thereby have become moot. We will therefore first consider the question of the validity *vel non* of the alleged repealing act.

One of the reasons assigned by the appellant for its contention that the repealing act is invalid is that the Journal of the House of Representatives does not show that the same bill which was passed by the Senate was passed by the House.

The title of Senate bill No. 656, as it passed the Senate was as follows:

"A bill to be entitled An Act repealing An Act entitled: 'An Act to authorize and empower the Board of County Commissioners of Volusia County, Florida, for and on behalf of said county, to issue and sell negotiable interest bearing bonds of said county in an amount not to exceed in the aggregate Two Hundred Fifty Thousand ($250,000.00) Dollars, in such denomination as said board of county commissioners may deem proper; to mature at a time or times not longer than thirty years from the date of issuance; to bear interest not to exceed six per centum per annum, payable semi-annually, for the purpose of raising funds

with which to refund, pay off, liquidate and retire any part or portion of the bonded or time warrant indebtedness of said county, and any interest to accrue on said indebtedness, and to refund, reimburse and repay to any of the designated funds of said county, such moneys as have heretofore been appropriated or transferred therefrom to any other designated fund or funds of said county; to provide the manner of execution, and sale of said bonds; and to provide for the payment thereof, and the raising of funds for such payment,' known as Chapter 13488 of the Laws of the State of Florida, approved June 6, 1927.''

The introduction of this bill into the House of Representatives was by message of transmittal from the Senate which referred to Senate Bill No. 656 and a number of other Senate bills, which message was signed by the Secretary of the Senate and addressed to the Speaker of the House of Representatives and recited ''that the Senate has passed

''Senate Bill No. 656:

Authorizing County Commissioners of Volusia County, Florida, to issue $250,000.00 in bonds, etc.

(Notice of publication and certificate attached to bill).

And respectfully requests the concurrence of the House therein.''

The above message of transmittal identified all the other bills referred to therein by setting out their titles in full, as well as by number, but this bill, as above shown, is referred to in a most unusual manner.

The next entry in the Journal of the House shows that Senate Bill No. 656, and other Senate bills enumerated in the message from the Senate above referred to, were

''read the first time by their titles,''

and then follows the entries showing the passage of each

of the Senate bills, *seriatim*, the entry regarding the bill here in question, with the exception of the names of the members voting for the bill, which, not being material here, we omit, being as follows:

"Mr. Fullerton moved that the rules be waived and that Senate Bill No. 656 be read a second time by its title only.

Which was agreed to by a two-thirds vote.

An Senate Bill No. 656 was read a second time by its title only.

Mr. Fullerton moved that the rules be further waived and that Senate Bill No. 656 be read a third time in full and put upon its passage.

Which was agreed to by a two-thirds vote.

And Senate Bill No. 656 was read a third time in full.

Upon call of the roll on the passage of the bill the vote was:

Yeas—(Naming each member voting yea) 94.

Nays—None.

So the bill passed, title as stated.

And the same was ordered certified to the Senate."

Later, the Journal of the House shows a report of the joint committee on enrolled bills which reports that certain bills, including the bill here in question, had been correctly enrolled, referring to this particular bill as Senate Bill No. 656, and giving its title in full, being the same title which the bill bore when adopted by the Senate and hereinabove quoted. The Journal also recites that the bills and resolutions contained in the above report were thereupon duly signed by the speaker and chief clerk of the House of Representatives in open session, and ordered referred to the chairman of the Committee on Enrolled Bills to be conveyed to the Senate for the signature of the president and secre-

tary thereof. The Senate Journal shows a message from the House reporting the passage of this bill among others and correctly describes the bill by number and original title in full. Thereafter, the report of the joint committee on enrolled bills shows that the bill in question, properly described by number and original title, had been presented to the Governor for his approval.

It thus appears that the Journal records of this bill in both houses all refer to it as Senate Bill No. 656 with the same title as the bill had when passed by the Senate, with the one vital exception above set forth, covering the introduction into and adoption of the bill by the House. According to this important entry, however, the bill transmitted from the Senate and passed by the House by a vote of 94 yeas and no nays, was:

"Senate Bill No. 656:

· Authorizing County Commissioners of Volusia County, Florida, to issue $250,000.00 in bonds," etc.·

This title or description was not only misleading; it was directly contrary to the nature and character of the bill and the title thereto, which was .passed by the· Senate, and which, instead of authorizing the· County Commissioners of Volusia County to issue $250,000.00 in bonds, repealed the Act of 1927, which did so authorize them.

The question arises, does the fact that the subsequent reports of the enrollment committees correctly describing the bill by both number and title just as it passed the Senate, cure the failure of the House Journal entry to show, except by the number, the passage by the House of the bill which the Senate had passed? It will be noted that while the number was the same,. the House Journal entry described an entirely different sort of bill, and shows the passage by the House of a bill radically different from that which the Senate had passed under the same number. .

It was early held in State v. Brown, 20 Fla. 407, that if the legislative journals clearly show that a bill was not passed in a constitutional manner, it cannot be recognized as a law. The question there involved was whether a certain amendment to a bill which was not incorporated in the enrolled bill had been adopted as a part of the Act. The Court held that it had not. In the course of the opinion by RANDALL, C. J., it is said: ''Now, the Senate Journal does not show that such an amendment was moved or voted upon in the Senate. The only indication that such amendment had been made is in the letter of the clerk of the Assembly to the president of the Senate. The clerk of the Assembly is not the proper source of information as to the action of the Senate, and nowhere else do we find the statement.'' Elsewhere in the opinion it was said: ''The Constitution requires the keeping of the journals of their proceedings by the respective Houses of the Legislature; and these journals are received as evidence of such proceedings. When an act is duly approved and published, it is *prima facie* a law; but if the legislative journals show that instead of being passed, it was defeated, or that it is not the same that was passed, it is not a law.''

It will not be presumed from the mere silence of the journals that either house has disregarded a constitutional requirement, except in cases where the Constitution has expressly required the journals to show the action taken, but in such cases their silence will be fatal to the alleged law. State ex rel. v. Green, 36 Fla. 154, 18 So. R. 334. It was also held in that case that where the title of an act, as it passed the legislative bodies, and when approved by the Governor, is so essentially different as to affect the whole act, it cannot be said that the same act received the sanction of the entire legislative department, of which the Governor acts as a part, but that if the difference is immaterial or unsubstantial, it will not annul the law.

When the journals of the Legislature speak as to the title of an act, and the enrolled bill contains a variance therefrom, the journals will control. Wade v. Atlantic Lumber Co., 51 Fla. 628, 41 So. R. 72. In that case, the journals of the two houses disclosed that a bill had been voted on by them with a certain title, whereas the report of the joint enrollment committee gave the bill a substantially different title. The opinion by Justice COCKRELL contains this terse comment: "This Court is firmly committed to the holding that when the journals speak, they control, and as against such proof the enrolled bill is not conclusive."

In Morris v. City of Gainesville, 60 Fla. 338, 53 So. R. 739, in an opinion by Chief Justice WHITFIELD, it was held that the number of a bill is no part of the act, but is a method of convenient handling of bills in legislative procedure, and that where it appears from consecutive entries in a legislative journal that the number of a bill put upon its passage is mistakenly given and the identity of the bill passed is made certain by its title, the error in the number is not fatal.

In Goff v. Rickerson, 61 Fla. 29, 54 So. R. 264, it was said: "The Constitution requires the journals to show the passage of a bill by each house, and of course to become a law, the same bill must be shown by the journals to have been properly passed in each house; but the Constitution does not require the journals to show the enrolling and signing of bills that have been passed." It was held in that case that, as the journals showed the passage of the bill, the fact that the entries in the journal of the house as to the enrollment and signing of the bill were not in the exact order of actual or logical sequence, would not invalidate the act.

The principle involved here is quite well indicated by the

holding in State v. Bethea, 61 Fla. 60, 55 So. R. 550, as shown by the 5th and 6th headnotes, certain portions of which we have italicized, which read: .

"The numbers of·titles of bills are given in the journals for the purpose of identification and information as to the contents of the bill. ·Even though a portion of a lengthy title is omitted in some of the journal entries, yet where it clearly appears that the entries *apparently refer to the same bill and give fair notice of its contents,* this is at least *prima facie* sufficient.

Where the journals clearly show that a bill was passed by the House of Representatives by its full title and was transmitted to and read by the Senate by the same title, and that the bill was passed by the Senate by an abbreviated *but no misleading. title,* but it appears that although the journal entries as to the bills were not uniform the same bill *by a sufficient title* was considered in and duly passed by each house, the act is not void on the ground that it appears the same bill was not passed by each house."

In the opinion by Mr. Chief Justice WHITFIELD, in the case just cited, it is said: "The Constitution does not regulate the manner in which bills are referred to in the journals of the Legislature, and the courts can impose no such regulation. No constitutional provision appears to have been violated in the entries referred to and they were not of a misleading character." Citing Goff v. Rickerson, *supra.*

See also Amos v. Mosley, 74 Fla. 555, 77 So. R. 619, and Gwynn v. Hardee, 92 Fla. 543, 110 So. R. 343.

Applying the principles established by the cited cases it appears that this act must fall. The house journal entries fail to show the passage by the house of the same bill which the senate had passed, but, *per contra,* show the passage of

a bill of a radically different character. Though the bill as passed by the house bore the same number as that which had passed the senate, the number is no part of the bill, while the title is, and where there is conflict between the numbers and the title, the title must control. Nor can the error be cured by subsequent entries of reports of enrolling committees, etc., as the Constitution requires the journals to show the passage of bills, but does not require them to show the reports of committees on enrollment, and those journal entries which the Constitution requires must control, as evidence, over those which are not so required, when there is conflict between them. The house journal entry in this case shows that the bill in question passed, ''title as stated,'' and the title as stated was, as above shown, directly the opposite in meaning to that which a bill, bearing the same number, had when it passed the senate. The senate title indicated a bill repealing an act authorizing an issue of bonds, whereas the title of the bill passed by the house indicated a bill authorizing an issue of bonds, and was necessarily calculated to mislead the house as to the nature and character of the bill. It cannot be said that the journal entries purporting to deal with the actual passage of the bill, and which the Constitution requires to be made, affirmatively show that the same bill passed both of the legislative bodies, and hence the bill did not become a law.

The repealing act not having been constitutionally adopted, the original act stands, and the questions raised on this appeal are not moot.

The first question raised by the demurrers to the petition for validation is that the resolution of the board of county commissioners authorizing issuance of the bonds is fatally defective because the title of the resolution does not state the purpose for which the bonds are to be issued, and is

therefore not in compliance with Section 16 of Article III of the Constitution. That section is limited by its terms to acts of the Legislature, and our attention has not been called to any law regulating, or even requiring, titles to resolutions adopted by boards of county commissioners. 43 C. J. 521.

The next question raised is that the resolution adopted by the board and set forth in the petition is itself defective in that it also fails to set up for what purposes the bonds are to be issued and for what purposes the proceeds will be used. The first section of the resolution, omitting the introductory matter, reads:

"Section 1. That negotiable interest bearing bonds of the County of Volusia, Florida, authorized in and by Chapter 13488, Laws of Florida, Acts of 1927, in the aggregate amount of Two Hundred Fifty Thousand ($250,000.00) Dollars, to be issued for the purpose of raising funds with which to refund, pay off and retire a portion of the bonded or time warrant indebtedness of said county, and/or the interest on such indebtedness and/or to refund, reimburse and repay to any of the designated funds of said county such moneys as have heretofore, and prior to the sixth day of June, 1927, been appropriated or transferred therefrom to any other designated fund or funds of said county."

The language of the resolution follows substantially the language of the act. It states no purpose which was not stated in the act. While it might well be the better practice for a resolution of this sort to be more specific as to the particular purposes for which the bonds are to be issued and the amount of bonds required for each stated purpose (which appears to be the intent of our general statute relating to the issuance of county bonds for roads, public

buildings and funding of county indebtedness, Section 2309, Comp. Gen. Laws 1927; see Potter v. Lainhart, 44 Fla. 647, 33 So. R. 251, and Hillsborough County v. Henderson, 45 Fla. 356), this statute authorizes the issuance of bonds for certain named purposes, and requires the resolution of the board of county commissioners to determine certain things with reference to the bonds to be issued, but does not require such resolution to specify the particular purpose or purposes, within the scope of the act, for which the bonds are to be issued. The purposes stated in general terms in the resolution as adopted are all such as were authorized by the act, in practically the same language. The rule laid down in Perry v. Town of Panama City, 67 Fla. 285, 65 So. R. 6, is applicable here and negatives the force of the demurrer on this point. In that case, the statute authorized municipalities to issue bonds for certain named purposes, "or any other municipal purpose." The ordinance adopted merely provided that the bonds would be issued "for municipal purposes." This Court, in an opinion by Mr. Justice WHITFIELD, said:

"There is no statutory requirement that the particular or specific municipal purpose for which the proceeds of the bonds are to be used, shall be designated or mentioned in the ordinance providing for the issuance of said bonds, or in any proceedings relating thereto. The forms and proceedings to be observed in the submission of the question of issuing the bonds to the electors are to be "in such manner and after such public notice as may be deemed necessary by the city council." Municipal bonds can lawfully be issued only for municipal purposes; and when a proposed issue of bonds appears to be for a "municipal purpose," the statute does not require the proceedings taken by the municipality or by the proper electorate preliminary

to the issue of the bonds, to designate the particular municipal purpose for which they are intended to be used. It does not appear that the city council by any appropriate action taken required the particular municipal purpose for which the bonds are to be used to be stated in any of the proceedings taken by the city or the electors.

"Where a municipality is duly authorized to exercise a particular municipal function and the manner of the exercise of the authority is not defined by statute but is left to the city council, the courts will not undertake to control the manner of the exercise of the authority by the city council where no applicable rule of law is violated, and the authority given is not exceeded or abused."

One of the grounds of the demurrer is that it does not appear from the petition that any provision has been made for a sinking fund. The resolution provides for a sinking fund in a general way and requires that the board shall levy annually an ad valorem tax in the manner provided in the act sufficient to pay the interest and principal on said bonds, but no specific levy is actually made in the resolution. This may be done later before the bonds are advertised and disposed of, as was held in Potter v. Lainhart, *supra*.

The question of antedating the bonds, as of a date several months prior to the adoption of the resolution, is one of the questions raised by the demurrers. The act neither expressly authorizes nor expressly prohibits the antedating of the bonds.

In 15 C. J., 623, it is said: "The form, the terms and the conditions of county bonds are matters of administration and detail which the Legislature may properly leave to the consideration and discretion of the county board.

\* \* \* The antedating of bonds has been held not to affect their validity''; citing several cases. We are not prepared to hold that this irregularity invalidates the proposed bonds, or that such antedating of these bonds to a date some four or five months prior to the adoption of the resolution was beyond the power or authority of the board of county commissioners under this act. The act does provide that the bonds issued ''shall mature at a time or times not longer than thirty years from the date of issuance,'' and shall bear interest not exceeding six per cent per annum, payable semi-annually, but says nothing about the dating of the bonds. It also provides that the bonds shall not be sold for less than 95 cents on the dollar, plus accrued interest thereon to date of delivery, which affords some protection against any loss to the county because of the antedating of the bonds. See also in this connection Lasseler v. State, 67 Fla. 240.

The demurrers also state that the act is unconstitutional because it provides, in the body of the act, that, ''where funds realized from the sale of any or all of the bonds herein authorized are used to refund, pay off, liquidate and retire an indebtedness of a certain county commissioner's district or a certain special taxing district of said county,'' then the commissioners may levy a tax on the property in such district sufficient to pay off the interest and principal of the bonds so issued for such purpose. This provision assumes that the county commissioners are authorized elsewhere in the act to issue bonds for such a purpose, which is not the case. Aside from this, the quoted provision is entirely beyond the scope of the title to the act, which gives no intimation whatever that the bonds of the county shall be issued for any such purpose, and which purpose is not germane to the subject of the act as expressed in the title. It is therefore null and void, and no part of the act, but

its elimination does not impair the remainder of the act. Furthermore, the resolution of the county board does not seek to issue bonds for any such purpose. Both the statute and the resolution deal with county bonds for county purposes. It is obviously unnecessary for us to discuss the argued question as to whether the Legislature has the power to authorize a. county to bond itself to pay a special district debt.

It is further contended that this was an emergency statute, and that after the lapse of more than two years from its adoption it should be regarded as *functus officio*, citing Smith v. Milton, 61 Fla. 745, 54 So. R. 179. We cannot find from the face of the act, or of the pleadings, whether the need which this act was designed to fill had passed when the resolution was adopted in November, 1928, a year and a half after the passage of the act, or not. This question, if it had any merit, would have to be raised by answer, not by demurrer.

It is also intimated that an illegal application of the funds to be raised by the bond issue is contemplated. This is a question affecting the disbursement of the proceeds, but does not affect the validity of the proposed bond issue, in validation proceedings, there being nothing in such proceedings to show any contemplated illegal application, and the general presumption being that the chosen officials of the county will do their duty. See West v. Town of Lake Placid, 120 So. R. 361.

The court below erred in sustaining the demurrers and in dismissing the petition.

Reversed and remanded.

Terrell, C. J., and Ellis, J., concur.

Whitfield, C. J., and Strum and Buford, J. J., concur in the opinion and judgment.